**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5192-16T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

LOUIS M. COSCIA,

    Defendant-Appellant.

_____

Submitted September 25, 2018 – Decided  October 24, 2018

Before Judges Yannotti, Rothstadt and Natali.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 14-07-1315.

Joseph E. Krakora, Public Defender, attorney for appellant (Laura B. Lasota, Assistant Deputy Public Defender, of counsel and on the brief).

Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney for respondent (Ian D. Brater, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After the trial court denied defendant's motion to suppress, he pled guilty to first-degree robbery, contrary to N.J.S.A. 2C:15-1. The trial court sentenced defendant to a seven-year prison term, and required that he serve eighty-five percent of that sentence, pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant appeals from the judgment of conviction dated April 20, 2017. We affirm.

I.

In July 2014, a Monmouth County grand jury returned an indictment charging defendant with first-degree armed robbery of I.A., N.J.S.A. 2C:15-1 (count one); and fourth-degree unlawful possession of an imitation firearm, N.J.S.A. 2C:39-4(e) (count two).[1] Defendant also was charged in Complaint No. W2014-158-1335 with the disorderly persons offense of defiant trespass, N.J.S.A. 2C:18-3(b).

Thereafter, defendant filed motions to suppress the victim's identification of him, and physical evidence the police had seized in a search. On July 8, 2015, the motion judge conducted an evidentiary hearing on the motions. On July 14, 2015, the judge placed an oral decision on the record and denied the motions.

---

[1] We use initials to identify the victim and others in order to protect their privacy.

On January 9, 2017, defendant pled guilty to first-degree armed robbery, as charged in count one of the indictment. In exchange, the State agreed to the dismissal of count two of the indictment and the defiant trespasser charge. The State also agreed to recommend that the armed robbery be considered a second-degree offense for sentencing, and that the court impose a seven-year custodial sentence subject to NERA, to be served concurrently with a sentence that defendant was then serving, with appropriate monetary penalties and assessments. On April 7, 2017, another judge sentenced defendant in accordance with the plea agreement. This appeal followed.

On appeal, defendant does not challenge the denial of his motion to suppress the identification evidence. However, he raises the following argument:

> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS AN IMITATION HANDGUN FOUND DURING A SEARCH OF [A RESIDENCE ON] BENNETT AVENUE AFTER POLICE HAD ILLEGALLY ENTERED THE RESIDENCE.

II.

We briefly summarize the evidence presented at the hearing on defendant's motion to suppress. Around 1:30 a.m. on March 22, 2014, I.A., a taxi driver for Citi Cab, was dispatched to a pizzeria in Neptune to pick up a

3

fare. When I.A. arrived at the pizzeria, he observed a group of people standing outside and defendant standing alone. I.A. began driving towards the group, thinking they called for the ride, but defendant yelled out to him and approached the driver-side window of the taxi. After defendant confirmed he called for a cab, he entered the vehicle and sat directly behind I.A.

I.A. began driving and asked defendant where he was going. Defendant said he was not sure, but thought he was going to Emerson Place. I.A. began driving to that location, but when they got closer defendant directed him to another street. Defendant then abruptly asked I.A. to stop the taxi. When I.A. stopped, defendant put a gun to his neck and demanded his money, car keys, and phone.

I.A. pleaded with defendant not to take his car keys and leave him stranded. Defendant responded, "I'm not going to leave you stranded[,]" and he exited the taxi, started walking, and threw the keys in the street. I.A. began looking for the keys when he noticed defendant walk back toward the cab and look inside. Defendant took a backpack out of the cab and I.A. realized defendant's gun was not showing. I.A. grabbed defendant's backpack, and a brief struggle ensued. Defendant threw money in the air, gained possession of the backpack, and fled. I.A. called the police.

Detective Sergeant Keith Mitchell of the Neptune City Police Department (NCPD) was assigned to investigate the incident. Mitchell took I.A.'s statement and reviewed video surveillance footage obtained from the pizzeria. Several days later, J.M. contacted the police and indicated he had information regarding the robbery. J.M. told Mitchell he lived with defendant in a residence on Bennett Avenue in Neptune City and identified defendant as the perpetrator of the robbery. J.M. said that on the night of the robbery, defendant expressed interest in committing a robbery, left the residence, and returned out of breath stating he robbed a cab driver and "got $60 out of him."

J.M. told Mitchell defendant wanted to rob another cab driver and possessed "an Airsoft gun that shot pellets[,]" which defendant stored in the basement of the Bennett Avenue residence. J.M. believed defendant was at the Bennett Avenue location at that time. After the interview concluded, Mitchell ran a warrant check and discovered defendant had an active warrant which had been issued in Hamilton Township. Mitchell, another NCPD detective, and two officers from another police department, went to the Bennett Avenue residence.

Mitchell testified that he was familiar with the residence because in January 2014, the police had received complaints of consistent drug-related activity occurring there. The police and K.C., the owner of the property, had

developed a plan to combat this problem by posting no trespassing signs, evicting anyone who was not supposed to be on the premises, and providing the police with a list of individuals who were permitted to be there. Defendant and J.M. were not on the list.

In February 2014, defendant and J.M. were arrested at the Bennett Avenue residence for "trespass[ing] and loitering to obtain a controlled dangerous substance." Defendant was told that he was not supposed to be on the premises and he indicated he understood.

On March 25, 2014, when the police arrived at the home, Mitchell said he noticed "silhouettes in the windows upstairs on the second floor." According to Mitchell, the outside door to the house was open six to eight inches. The police knocked on the door and announced their presence, but no one answered. The officers entered the outside door and proceeded to the main door, which was completely open. The officers again knocked and announced, but there was no answer.

The police entered the house and proceeded up the stairs. C.C., K.C.'s stepson, emerged from a room. While the police were speaking with C.C., defendant appeared and was promptly arrested. Mitchell explained to C.C. that the police were looking for a gun and C.C. responded, "Oh, that's [defendant's]

gun, it's downstairs." C.C. then executed a consent-to-search form and the officers located an imitation handgun in the basement.

C.C.'s account of the circumstances surrounding defendant and the police encounter on March 25, 2014, differed from Mitchell's account. C.C. testified that there was a storm door on the house and that the front doors were definitely closed that night. He said he knew about his stepmother's list of persons who were permitted on the premises, but he was unsure whether defendant was on the list.

C.C. further testified that defendant had been given permission to stay at the house. According to C.C., defendant paid rent to his brother, who then gave the rent to his stepmother. C.C. further testified that he did not recall defendant ever coming to the house out of breath. He said his brother had a gun in the basement, but conceded there might have been other guns in the house.

C.C. admitted he had a criminal record and was high on heroin the night defendant was arrested. C.C. said that when the police entered the home, he was sleeping and awoke when the officers ran up the stairs. According to C.C., the police entered his room and brought him downstairs where they told him they were looking for a gun.

7

C.C. stated that the police told him that if he did not let them search the premises, "[they] all would have to leave the house until [the police] got a warrant," and the police would charge him with anything they found. C.C. testified that he felt his consent was not voluntary because he "[did not] want to be charged with anything." C.C. said the police never informed him he could refuse to consent.

The motion judge placed his decision on the record. The judge found that the officers had testified credibly and that C.C.'s "credibility [was] severely in question." The judge noted that C.C. "was simply overwhelmed" by the drugs he had taken on the night in question, and his testimony was not "worthy of belief" because he had been under the influence of heroin. The judge found that when the officers came to the residence on Bennett Avenue, the inner door was ajar.

The judge noted that the police were familiar with the premises because they had been there many times. They knew C.C. The officers entered the house to secure C.C.'s consent for the search. The judge found that there were no exigent circumstances for a warrantless search of the premises. The judge determined, however, that the officers had validly obtained consent-to-search

8

the premises in order to locate the weapon allegedly used in the robbery. The judge concluded the search was reasonable.

III.

As noted, defendant argues that the motion judge erred by denying his motion to suppress the imitation gun. He contends the police unlawfully entered the house and did not have authority to undertake a warrantless search of the premises. In response, the State first argues that defendant does not have standing to challenge the search.

Under federal law, an individual only has standing to contest a search or seizure where the individual "ha[s] a 'legitimate expectation of privacy in the premises' searched." Byrd v. United States, ___ U.S. ___, 138 S. Ct. 1518, 1526 (2018) (quoting Rakas v. Illinois, 439 U.S. 128, 143 (1978)). To establish standing, the individual must show that he had "an actual (subjective) expectation of privacy and . . . that the expectation [is] one that society is prepared to recognize as 'reasonable.'" Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). A trespasser does not have standing because he does not have a "legitimate" expectation of privacy. See, e.g., Rakas, 439 U.S. at 143 n.12 ("A burglar plying his trade in a summer cabin during the off season

9

may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as 'legitimate.'").

New Jersey's standing jurisprudence differs from federal law in that "a criminal defendant is entitled to bring a motion to suppress evidence obtained in an unlawful search and seizure if he has a proprietary, possessory or participatory interest in either the place searched or the property seized." State v. Alston, 88 N.J. 211, 228 (1981) (citations omitted). "Unlike federal law, New Jersey law confers automatic standing on a defendant 'in cases where the defendant is charged with an offense in which possession of the seized evidence at the time of the contested search is an essential element of guilt.'" State v. Hinton, 216 N.J. 211, 233-34 (2013) (quoting Alston, 88 N.J. at 228).

Where real property is concerned, however, our Supreme Court has recognized three exceptions to automatic standing. State v. Randolph, 228 N.J. 566, 585 (2017). "An accused will not have standing to challenge a search of abandoned property, property on which he was trespassing, or property from which he was lawfully evicted." Ibid. (citations omitted). A trespasser does not have standing because "a trespasser, by definition does not have a possessory or proprietary interest in property where he does not belong—where he does not

have permission or consent to be." Id. at 586 (quoting State v. Brown, 216 N.J. 508, 535 (2014)).

"[T]he State bears the burden of proving by a preponderance of the evidence that the building is abandoned or defendant[] [is a] trespasser[]." Brown, 216 N.J. at 529 (citing State v. Frankel, 179 N.J. 586, 598 (2004), overruled in part by State v. Edmonds, 211 N.J. 117 (2012)). Therefore, "[i]f the State can establish that, 'in light of the totality of the circumstances, a police officer ha[d] an objectively reasonable basis to believe . . . [the defendant] was a trespasser,' a defendant will not have standing to challenge a search." Randolph, 228 N.J. at 587 (second and third alteration in original) (quoting Brown, 216 N.J. at 532, 535).

On appeal, defendant argues he has standing to contest the officers' entry into the home because the State did not sustain its burden of demonstrating that he was a trespasser. He claims the State was required to take "the 'practical step' of calling the home's owner . . . to confirm that defendant was not permitted at the residence." We do not agree.

In Randolph, the Court stated that it "did not suggest in Brown that a records check is the only means for determining whether . . . a defendant is a trespasser." Id. at 586 (citing Brown, 216 N.J. at 533). Instead, police can use

11

their "personal knowledge of the neighborhood and its residents[.]" Ibid. (citing Brown, 216 N.J. at 534). No one factor or course of conduct is dispositive; the test looks to the totality of the circumstances. See id. at 587.

Here, the judge noted that the property owner wanted the police to rid the house of certain people, including defendant and J.M., who came there from time-to-time. The judge pointed out that it was not clear whether defendant and J.M. were paying rent. The judge noted that C.C.'s testimony on this issue was not clear.

C.C. said he believed defendant was paying his brother rent, which his brother then turned over to the owner, but the judge found C.C.'s testimony was not credible. The judge noted that the owner had provided the police with a list of individuals who were allowed on the property, and defendant was not on the list. The judge said "that[,] at least from the owner's point of view[,] . . . this defendant was not welcome into the home."

The judge did not, however, find that the State had carried its burden of showing that defendant was a trespasser and apparently assumed defendant had standing. There was evidence showing that defendant was trespassing on the premises at the time of the search, but the evidence was not conclusive. We therefore will assume defendant has standing to challenge the search.

12

IV.

Defendant argues the trial court should have suppressed the imitation gun because the police seized the gun in what defendant claims was an unlawful, warrantless search of the Bennett Avenue residence. Defendant argues that the police unlawfully entered the premises, and there were no exigent circumstances permitting a warrantless search. Defendant further argues that C.C.'s consent-to-search was invalid because the police obtained his consent after the alleged illegal entry into the home.

Under New Jersey law, "an arrest warrant is not lawfully executed in a dwelling unless the officers executing the warrant have objectively reasonable bases for believing that the person named in the warrant both resides in the dwelling and is within the dwelling at the time." State v. Miller, 342 N.J. Super. 474, 479 (App. Div. 2001). In determining whether the police have objectively reasonable bases for their beliefs, the police cannot simply rely on unsubstantiated statements. See, e.g., State v. Cleveland, 371 N.J. Super. 286, 291, 295 (App. Div. 2004) (holding that an informant's statement to police that "defendant was 'staying' with a woman" at a hotel did not constitute objectively reasonable grounds to believe the defendant resided at the hotel).

A-5192-16T4

In Miller, police had a valid parole warrant for the defendant. 342 N.J. Super. at 480. After many failed attempts at executing the warrant, the police tried another address. Id. at 481. The defendant was not at that location, but the occupant told them the defendant was living with his children and their mother at another location. Ibid. Without corroborating that information, the police went to the location and found the defendant. Ibid. We held the officers did not have an objectively reasonable basis to enter the property because they "did nothing to confirm independently the snippet of opinion they had received from [the occupant]." Id. at 500. We stated that police must confirm the information obtained "by observation, investigation, or other inquiry." Id. at 497.

In this case, defendant argues the officers did not have an objectively reasonable basis to believe that he was residing at the Bennett Avenue residence because they did not contact the property owner to determine whether he had been added to the list of persons who were permitted on the premises. We disagree. The officers had other information, which provided them with an objectively reasonable basis to believe defendant was residing in the home.

As we stated previously, J.M. told Mitchell he was living with defendant in the house on Bennett Avenue. In addition, the police were familiar with the residence and knew that defendant had previously lived there, apparently

14

without the owner's permission. Therefore, the officers had an objectively reasonable basis for believing defendant was residing at the Bennett Place property.

The officers also had an objectively reasonable basis for believing defendant was present at the house when they executed the warrant. During his interview, J.M. told Mitchell "he thought [defendant] was at the house" at that time. When the police arrived, Miller observed silhouettes in the second-floor windows, which indicated someone was at home. We conclude the officers were validly on the premises when they obtained C.C.'s consent-to-search.

V.

Defendant also argues that C.C. did not provide a valid consent-to-search the premises. He contends C.C.'s consent was not voluntary. Again, we disagree.

Under the Fourth Amendment to the United States Constitution, the State has the burden of showing the consent-to-search was "freely and voluntarily given." Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973) (citing Bumper v. North Carolina, 391 U.S. 543, 548 (1968)). Although the search-and-seizure provision in Article 1, paragraph 7 of the New Jersey Constitution is similar to its federal counterpart, "consent searches under the New Jersey Constitution are

afforded a higher level of scrutiny." State v. Carty, 170 N.J. 632, 639, modified, 174 N.J. 351 (2002).

To justify a warrantless search based on consent, "the State must prove that the consent was voluntary and that the consenting party understood his or her right to refuse consent." State v. Maristany, 133 N.J. 299, 305 (1993) (citing State v. Johnson, 68 N.J. 349, 353-354 (1975)). The State is required to "prove voluntariness by 'clear and positive testimony.'" State v. Chapman, 332 N.J. Super. 452, 466 (App. Div. 2000) (quoting State v. King, 44 N.J. 346, 352 (1965)). The State must "show that the individual giving consent knew that he or she 'had a choice in the matter.'" Carty, 170 N.J. at 639 (quoting Johnson, 68 N.J. at 354).

Factors "tending to show that the consent was coerced" include: (1) consent was obtained from a person who had already been arrested; (2) it was obtained notwithstanding a denial of guilt; (3) the police obtained consent only after the consenting person had refused initial requests for consent; (4) consent was given where the subsequent search led to the seizure of contraband that the accused must have known would have been discovered; and (5) consent was given by a person in handcuffs. King, 44 N.J. at 352-53 (citations omitted).

Furthermore, factors "tending to show voluntariness of the consent" include: "(1) that consent was given where the accused had reason to believe that the police would find no contraband; (2) that the defendant admitted his guilt before consent; (3) that the defendant affirmatively assisted the police officers." Id. at 353 (citations omitted). "[T]he existence or absence of one or more of the above factors is not determinative of the issue." Ibid. Rather, the factors "are only guideposts to aid a trial judge in arriving at his conclusion[.]" Ibid.

At the suppression hearing, Mitchell testified that once he told C.C. the police were looking for a gun, C.C. immediately responded that it was defendant's gun, and it was downstairs in the basement of the house. Mitchell then indicated he wanted to search the premises, and C.C. quickly responded, "Okay. No problem." C.C. was not in handcuffs at the time, and the officers never placed him under arrest. C.C. did not hesitate and began cooperating with the police, as soon as he learned of their objective.

Furthermore, Mitchell testified that he advised C.C. that he had the right to refuse the search, that he could revoke his consent at any time, and that he could be present during the search. The consent form set forth C.C.'s rights, and C.C. signed the form. As noted previously, C.C. testified that Mitchell told him

if he did not consent, he would have to leave the residence and would subsequently be charged with anything discovered by police when they returned with a search warrant. The motion judge found, however, that C.C.'s testimony was not credible.

We conclude there is sufficient credible evidence in the record to support the judge's determination that C.C.'s consent was voluntary and not coerced. Defendant's other arguments on this issue lacks sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION